**In re M.T.G., INC., d/b/a Matrix Technologies Group, Debtor.**

**No. 95–48268.**

United States Bankruptcy Court, E.D. Michigan, Southern Division.

April 16, 2007.

Guy C. Vining, Wyandotte, MI, pro se.

Sharon M. Woods, Barris, Sott, Denn & Driker, Jonathan S. Green, Ralph E. McDowell, Robert G. Brower, Michael J. Reynolds, Detroit, MI, Brian Einhorn, Collins, Eihnorn & Farrell, P.C., Southfield, MI, Mark Shreve, Troy, MI, for Defendants.

## AMENDED OPINION REGARDING "FRAUD ON THE COURT" ISSUES

THOMAS J. TUCKER, Bankruptcy Judge.

This case is before the Court on a remand from the United States District Court, and on motions. The Court must determine whether the former Chapter 7 trustee in this case, Charles J. Taunt, and his attorneys committed fraud on the court, by failing to properly disclose a fee agreement that Taunt made with a secured creditor, Comerica Bank ("Comerica"), and then obtaining several orders from the Court that benefitted Comerica. The Court is unable to find, on the present record, that Taunt and his attorneys *intended* to deceive the Court or to commit a fraud on the court. But such intent is not required to find a fraud on the court, as that concept is defined in the case law. The Court concludes that Taunt and his attorneys did commit a fraud on the court, and will order appropriate relief.

## I. Statement of the case and facts[1]

### A. Background

This case has a long and complicated history, much of which predates the undersigned judge's tenure as a bankruptcy judge. This case was originally assigned to Bankruptcy Judge Ray Reynolds Graves. After Judge Graves's retirement from the bench, the case was assigned to Bankruptcy Judge Jeffrey R. Hughes of the Western District of Michigan, acting as a visiting judge. Previous written opinions of these judges dealt with the issues at hand, as did two opinions by United States District Judge Anna Diggs Taylor, who decided two appeals directly relevant to the present issues.

Much of the background and early procedural history is described in an opinion issued by Judge Hughes on January 29, 2002,[2] and this opinion will quote Judge Hughes's opinion at times to help state the case. As Judge Hughes began the chronology:

---

1. Unless otherwise noted, the facts stated in this opinion are undisputed.

2. ("Opinion Re: Consolidated Motion to Vacate 4/19/06, 4/30/96, and 8/29/96 Orders Because of Fraud Upon the Court" ("Hughes 2002 Opinion") (Docket # 913).)

Debtor designed and built tooling for the automotive industry. It filed a petition for relief under Chapter 11 of the Bankruptcy Code on August 6, 1995. Todd Halbert represented the Debtor in the Chapter 11 proceeding.

Comerica Bank ("Comerica") was the Debtor's primary lender. Comerica claimed a security interest in all of the Debtor's assets. The Debtor has never objected to either the amount of Comerica's claim or the validity of its security interest. However, the Debtor and Mr. Halbert have adamantly argued that it has a lender liability-type cause of action against Comerica which, if proven, would result in damages greater than whatever Debtor owes to Comerica.

The Debtor's Chapter 11 was short lived and the court converted the case to a Chapter 7 proceeding on February 8, 1996. Charles J. Taunt was appointed as the Chapter 7 trustee.[3]

## B. Taunt's undisclosed negotiations with Comerica in February 1996

At least as early as February 9, 1996, the day after Taunt's appointment as interim trustee, Taunt began having detailed discussions with Comerica about the terms under which Comerica would agree to compensate Taunt and his firm, Charles J. Taunt & Associates, for services associated with Taunt's liquidation of Comerica's collateral.[4]

On February 12, 1996, four days after his appointment as interim trustee, Taunt filed a "Verified Statement of Disinterest for Trustee to Employ Counsel," attesting that his law firm, Charles J. Taunt & Associates, was disinterested and could act as counsel for the trustee.[5] Under this Court's local rules, the filing of this Verified Statement meant that Taunt and his firm were appointed as counsel for Taunt without the need for a written order.[6] In that Verified Statement, Taunt stated, among other things:

That [Charles J. Taunt & Associates] has never been employed, represented or has any other connection with the debtor, the creditors, any other party in interest herein, ... that the firm has no interest adverse to the Trustee or the creditors herein, that the firm is disinterested within the meaning of that term as defined in the Bankruptcy Code and that he knows of no reason why the firm can not act as attorneys for the Trustee.[7]

In this Verified Statement, Taunt did not mention his ongoing negotiations with Comerica.

On February 13, 1996, the day after filing the Verified Statement of Disinterest, Taunt spoke to counsel for Comerica, John D. Hertzberg, about a surcharge agreement.[8] This was followed by a letter dated February 16, 1996 from Taunt's at-

---

3. (Hughes 2002 Opinion at 1–2.)

4. (See, e.g., Docket # 1154, Exhibit C (February 10, 1996 Memorandum from Kevin Ball to Charles J. Taunt).)

5. (Docket # # 317, 319.)

6. The current version of the Court's Local Rule on this subject is L.B.R. 2014–1(c) which provides:

    (c) Unless the trustee is also a creditor in the case, and unless the Court orders other-

wise, whenever a chapter 7 panel trustee seeks to be appointed as trustee's attorney, an order appointing that person as attorney shall be deemed to have been entered without formal entry of a written order, effective upon the filing of the verified statement required by the last sentence in F.R.Bankr. P.2014(a).

7. (Docket # 319.)

8. (See Docket # 1166, Exhibit 4 (first sentence of February 16, 1996 letter from Taunt to Hertzberg).)

torney, Kevin Ball, to Comerica's counsel Mr. Hertzberg, outlining a proposed service-and-fee agreement between the trustee and Comerica, and a proposed budget. The letter provided a signature line for the bank and asked the bank to sign if it agreed with the proposal.[9] The letter was signed by Paul G. Dufault, Comerica's then Assistant Vice President, on February 21, 1996, after Mr. Dufault had made some handwritten alterations to the proposal letter and the budget. In a letter dated March 1, 1996, Mr. Dufault retracted one of the handwritten changes he had made to the February 16 letter agreement.[10] In this opinion, the Court will sometimes refer to the agreement, for convenience, as the "Comerica Fee Agreement."

Neither Taunt nor his firm, Charles J. Taunt & Associates, ever supplemented their February 12, 1996 statement of disinterestedness, or filed a supplemental disclosure, to disclose the Comerica Fee Agreement or any of the negotiations relating to that agreement.

### C. The fee agreement between Taunt and Comerica

The Comerica Fee Agreement provided that Taunt would liquidate the Debtor's estate assets (all of which Comerica claimed as its collateral,) with certain exceptions. Operating under an initial budget totaling $25,000.00, trustee's counsel was to bill Comerica for legal services each month. Fees were to be billed on an hourly-rate basis, at the Taunt firm's usual hourly rates, and "compensation [was] not contingent upon [the] actual or perceived degree of success." Comerica was to pay the monthly invoices through a special "cash collateral account" maintained by

Comerica, "from which the Trustee [was permitted to] withdraw payments for all surchargeable items."[11] The agreement further required that all net proceeds from Taunt's liquidation of the assets would be paid to Comerica. It further stated that "[a]ny unresolved disputes concerning any invoice [of trustee's counsel] shall be submitted to the Court for resolution pursuant to motion under 11 [U.S.C. § ]506(c)."[12]

The agreement described the "[s]ervices for which Comerica shall be subject to surcharge" as including "the preservation and liquidation of all of the Debtor's machinery and equipment, the resolution of the Becker situation, and other lesser matters as detailed in the budget." The agreement stated that "[i]t is our understanding that the Bank does not wish the Trustee to pursue the recovery of escrowed funds, collection of accounts receivable, or the 'Injectronics' litigation. Surchargeable services would include all services of the type described herein rendered on or after February 8, 1996."[13]

With respect to claims the estate might have against Comerica, including possible lender-liability claims that Halbert and the Debtor believe existed, the Comerica Fee Agreement stated:

> Finally, it must be clearly understood that nothing in this proposal constitutes a waiver of any claims the estate might have against Comerica Bank. It is the Trustee's intention to investigate these claims fully, and we anticipate Comerica's full cooperation in that regard.[14]

The Comerica Fee Agreement and its budget did not indicate that Comerica would

---

9. (*Id.*)

10. (Docket # 1166, Exhibit 29.)

11. (Comerica Fee Agreement. (Docket # 1166, Exhibit 4) at 2.)

12. (*Id.*)

13. (*Id.*)

14. (*Id.*)

pay for the trustee's work in investigating or pursuing any claims against Comerica.

With respect to Comerica's secured claim, the agreement stated that Comerica would pay Taunt to evaluate the claim. It stated:

> Further, in order to fix the value of Comerica Bank's secured claim, we shall cause the Debtor's objection to that claim to be brought on for hearing as soon as possible.[15]

The budget attached to the agreement allocated $2,000.00 of the $25,000.00 budget to the following:

> Determination of Comerica Bank Secured Claim
>
> Obtain hearing date from Court and serve notice of same; **review/analyze Comerica Bank security documents and loan history; prepare written position on same for filing with Court;** appear at hearing; review/approve proposed order.[16]

Finally, the budget further stated that it "[a]ssumes all uncontested matters. In the event any matter becomes contested, the budget estimates do not apply." [17]

### D. Comerica's April 30, 1996 stay-relief order, and Taunt's first, limited disclosure that he had an agreement with Comerica

On March 13, 1996, Comerica filed a motion seeking relief from stay to permit Comerica to liquidate all of the personal property of the Debtor.[18] In its motion, Comerica alleged that it had a security interest in all of the personal property of the Debtor, that the amount of its claim exceeded the value of the personal property, and that the Debtor had no equity in the personal property.[19] The motion did not mention the Comerica Fee Agreement.

The Debtor (through its attorney Halbert) and Taunt filed objections to Comerica's stay-relief motion.[20] The trustee's objection, filed March 28, 1996, was styled as a "limited objection." In this document, the trustee objected to lifting the stay with respect to the estate's Chapter 5 causes of action. But the trustee consented to stay relief permitting Comerica to liquidate "specifically defined collateral," including accounts receivable other than any account receivable owing by or other claim against Becker Group and/or its affiliates; general intangibles other than claims the estate may have against Comerica or against the Becker Group; and other personal property of the Debtor, "except for all of the Debtor's machinery, equipment, and inventory, **which pursuant to the agreement between the Trustee and Comerica Bank are being liquidated by the Trustee.**" [21]

While the language just quoted from the trustee's objection can be read as disclosing and referring to some sort of surcharge agreement between the trustee and Comerica, the trustee's objection did not reveal any further details.

The objections of the Debtor and Taunt to the stay relief motion were settled and a consent order granting relief from stay was entered on April 30, 1996 (the "Comerica Relief from Stay Order").[22] That order was "approved for entry" by counsel for Comerica, the Debtor (through Hal-

---

**15.** (*Id.*)

**16.** *Id.* ("Trustee's Proposed Surcharge Budget" at 2 (attached to Comerica Fee Agreement)(emphasis added).)

**17.** (*Id.*)

**18.** (Docket # 346.)

**19.** (Docket # # 346, 347.)

**20.** (Docket # # 379, 392.)

**21.** (Docket # 392 at ¶¶ 1–2 (emphasis added).)

**22.** (Docket # 431.)

bert), and Taunt, and granted Comerica immediate stay relief with respect to the property for which Taunt consented to lifting the stay in his limited objection. The Order, in listing the categories of property covered by the stay relief, included: "[o]ther personal property of the Debtor, except for the Debtor's machinery equipment, and inventory, which pursuant to the agreement between the Trustee and Comerica Bank are being liquidated by the Trustee."[23] The Order did not reveal any other information about the "agreement between the Trustee and Comerica Bank."

### E. Taunt's March 5, 1996 disclosure of a $5,000.00 surcharge

The trustee referred to a surcharge of $5,000.00 in connection with a motion he filed on March 5, 1996 for authority to sell property of the estate at public auction, but did not disclose the Comerica Fee Agreement in these papers. The sale motion requested authority to conduct a public auction of the Debtor's personal property, and to pay himself a $5,000.00 surcharge:

> The balance of funds shall be disbursed to Comerica Bank, except that the Trustee shall be authorized to retain from such funds the sum of $5,000.00, as a surcharge for his fees incurred in connection with the sale pursuant to 11[U.S.C. § ]506(c)[.][24]

Only one objection to this sale motion was filed, by Millutensil, N.A., and that objection was settled.[25] On April 9, 1996, the Court entered an order granting the sale motion and authorizing the trustee to retain the $5,000.00 surcharge from the sale proceeds, in language identical to that contained in the motion.[26]

### F. The Becker Group settlement order and Taunt's April 15, 1996 disclosure that he had a surcharge agreement with Comerica

Taunt referred to a surcharge agreement with Comerica in a motion filed on April 15, 1996, in which he sought authority to compromise the estate's claims against Becker Group, Inc.[27] The application sought authority to compromise all disputes between the estate and Becker Group, Inc., including claims by the Debtor and Becker Group against each other under an agreement by which Debtor was to produce certain prototype molds and parts for Becker Group, and including "any claims arising out of the termination by Becker Group of a certain Asset Purchase Agreement between the Debtor and Becker Group."[28] As to the latter claims, Taunt stated that he "ha[d] investigated the ... transaction, and has determined that Becker Group's termination of the Asset Purchase Agreement was made in accordance with the terms of that agreement, and does not give rise to any claim by the estate against the [B]ecker Group."[29] The trustee's settlement motion disclosed to the Court that there was some sort of surcharge agreement between the trustee and Comerica, which pertained at least to the trustee's liquidation of the claims against Becker Group:

> The Trustee has determined that the proceeds of this proposed settlement agreement are subject to the security interest of Comerica Bank, and proposes that he be authorized to disburse said

---

23. (*Id.* at ¶ C.)

24. (Docket # 335 at 3 ¶ C.)

25. (Docket # 408.)

26. (Docket # 409 at 3 ¶ C; Docket # 408.)

27. (Docket # 411.)

28. (*Id.* at ¶ 9.)

29. (*Id.*)

proceeds to Comerica Bank upon their receipt, after deduction for **any outstanding expenses incurred by the Trustee in connection with the resolution of claims between the estate and Becker Group, including attorney fees, subject to surcharge pursuant to 11 [U.S.C. § ]506(c) and the separate agreement of the Trustee and Comerica Bank.**[30]

The settlement motion disclosed no further details regarding "the separate agreement" between Taunt and Comerica, and did not disclose whether that "separate agreement" relating to surcharge applied to anything other than the trustee's liquidation of the estate's claims against the Becker Group.

No one objected to the trustee's settlement motion, and on May 28, 1996, the Court entered an Order granting the motion.[31] The Order, which was signed by Judge Graves, contained language identical to language contained in the "application" quoted above, referring to "the separate agreement" between the trustee and Comerica.

## G. The April 19, 1996 Order allowing Comerica's secured claim

One of the Orders that Halbert and Guy C. Vining, the successor Chapter 7 trustee, allege was obtained by a fraud on the court is the April 19, 1996 "Order Allowing Claim of Comerica Bank" (the "Comerica Claim Allowance Order.")[32] The Debtor (through its attorney Halbert) had objected to Comerica's secured claim while the case was still in Chapter 11, on November 27, 1995.[33] In that objection, the Debtor stated, in part:

[T]he Debtor hereby objects to the amount, validity and enforceability of the Loan [alleged by Comerica Bank] and to the validity, perfection, priority and enforceability of the security interests and liens allegedly securing the Loan. The Debtor denies that such Loan and the alleged security therefor constitute allowable claims, secured or otherwise, against the Debtor, its assets or its estate.[34]

No hearing on the Debtor's claim objection was held before the case was converted to Chapter 7 on February 8, 1996. A hearing had been scheduled for February 22, 1996, but was adjourned to April 4, 1996.[35] That hearing apparently was adjourned until April 18, 1996, at which point the Court's minute entry indicates that the objection was settled.[36]

On April 19, 1996, the Court entered the Comerica Claim Allowance Order, which was signed as stipulated and agreed to by Taunt, Trustee's counsel, Kevin Ball, and John D. Hertzberg as counsel for Comerica. The record does not indicate that the Debtor or any other party stipulated or agreed to this Order. Apparently, the Court viewed Taunt as having succeeded the Debtor as the party asserting the objection to Comerica's secured claim, after the case was converted to Chapter 7. Although the order recites that the Court held a hearing on the claim objection, it is unclear from the record when or whether a hearing was actually held, and if so, who, if anyone, received notice of such hearing other than Taunt and Comerica.

The Comerica Claim Allowance Order stated that Comerica "shall have an al-

---

30. (*Id.* at ¶ 10 (emphasis added).)

31. (Docket # # 411, 446.)

32. (Docket # 422.)

33. (Docket # 153.)

34. (*Id.* at 1–2, ¶ 3.)

35. (Docket # 327.)

36. (Docket # 416.)

lowed claim ... in the amount of $5,304,563.63," and that Comerica "has a valid and properly perfected security interest in and lien on all property of Debtor's estate determined pursuant to Section 541 of the Bankruptcy Code, except for causes of action arising exclusively under Chapter 5 of the Bankruptcy Code ..., which liens and security interests secure the Allowed Claim."[37]

Except for the very limited disclosures described in Parts D–F above, there is no indication in the record, and no contention by any of the parties now, that Taunt or his firm made any disclosure to the Court of the Comerica Fee Agreement, or any reference to any fee or surcharge agreement of any kind with Comerica, before obtaining this order allowing Comerica's secured claim.

### H. The June 26, 1996 statement of disinterestedness by Taunt and his new firm, Plunkett & Cooney, P.C.

By June 26, 1996, Taunt had joined the law firm of Plunkett & Cooney, P.C. as a shareholder. On that day, Taunt filed a new "Verified Statement of Disinterest for Trustee to Employ Counsel."[38] After stating that Taunt was now a shareholder in the Plunkett & Cooney firm, the Verified Statement attested to that firm's disinterestedness. It made no mention of the Comerica Fee Agreement, or to any sort of agreement or arrangement between those parties. On August 21, 1996, the Court entered an Order substituting the Plunkett & Cooney firm for Charles J.

Taunt & Associates as counsel for the trustee.[39] Prior to entry, this Order was approved by Taunt and by the United States Trustee. The Order noted that "Charles J. Taunt & Associates has merged with Plunkett & Cooney, P.C. effective June 1, 1996[.]"[40]

### I. The August 29, 1996 order authorizing Taunt's settlement with Comerica

Another one of the Orders that Halbert and Vining, Trustee, allege was obtained by a fraud on the court is the August 29, 1996 "Order Granting Application to Compromise Causes of Action Against Comerica Bank" (the "Comerica Settlement Order.")[41] Taunt had filed an "Application to Compromise Causes of Action Against Comerica Bank" on July 3, 1996. The application sought an order authorizing Taunt to compromise any and all claims that the estate had against Comerica in exchange for payment by Comerica of $10,000.00.[42] Taunt's application described several specific lender-liability type claims against Comerica that "[c]ertain insider parties ha[d] raised," and noted "a dispute between the Trustee and Comerica Bank [about] whether certain claims against Richard May, a former principal of the Debtor, are property to which Comerica has previously obtained relief from the automatic stay."[43] The application described in some detail the investigation Taunt had done regarding the claims, and explained why Taunt had concluded that the claims against Comerica were "without value and of inconsequential benefit to the estate."[44] The application did not, howev-

---

**37.** (Docket # 422.)

**38.** (Docket # 450.)

**39.** (Consent Order for Substitution of Attorney for Trustee (Docket # 483).)

**40.** (*Id.* at 1.)

**41.** (Docket # 488.)

**42.** (Docket # 451.)

**43.** (*Id.* at ¶¶ 2–3.)

**44.** (*Id.* at ¶¶ 2, 3, 5, 6.)

er, mention anything about the Comerica Fee Agreement or about any sort of agreement between Taunt and Comerica, other than Comerica's offer to settle all claims of the estate for $10,000.00.

Only one party objected to the trustee's settlement motion—Kirk R. Vercnocke, the Debtor's President. That objection was filed by Todd Halbert, acting as attorney for Mr. Vercnocke. The objection did not state any grounds, but merely stated that Mr. Vercnocke objected to the motion and requested a hearing.[45] The Court set the trustee's motion for hearing on August 22, 1996, but that hearing was cancelled after Mr. Vercnocke, again through attorney Halbert, withdrew his objection on August 14, 1996.[46] The Comerica Settlement Order was then entered, on August 29, 1996.[47]

### J. The limited, vague disclosure of a surcharge agreement made in the December 18, 1996 fee application of Taunt's counsel

Taunt's law firm filed its first interim fee application on December 18, 1996. This was several months after entry of the last of the orders claimed to have been obtained by Taunt's fraud on the court (the last such order being the August 29, 1996 Comerica Settlement Order.) The fee application was filed jointly by Charles J. Taunt & Associates (which had merged into Plunkett & Cooney, P.C.) and Plunkett & Cooney, P.C.[48] The application makes a limited, and vague, disclosure of a surcharge agreement between the trustee and Comerica. In paragraph 13 of the fee application, the trustee's counsel stated:

> Applicant has received no prior payments **and none have been promised for services rendered or to be rendered in any capacity whatsoever in connection with this case** and no agreement or understanding exists between the Applicant and any other persons for the sharing of compensation received or to be received for services rendered in or in connection with this case, except normal compensation to employees of Applicant's firm, **except that the Trustee has entered into a surcharge agreement with Comerica Bank for compensation and reimbursement of expenses for services rendered in connection with the liquidation of Comerica's collateral.**[49]

Attached to the fee application, among other things, was a 23–page, single-spaced itemization of attorney time for the period from February 8, 1996 through October 28, 1996. The itemization included no time entries for Taunt himself. As some of the parties have pointed out, there is mention of a surcharge in a time entry for attorney Kevin Ball dated February 9, 1996. This entry merely states, however, that on that date, attorney Ball had a "[c]onference with Attorney Hertzberg and Mr. Dufault of Comerica re: validity of Comerica lien, assets to be liquidated and surcharge."[50]

---

45. (Docket # 465.) The Court's docket lists this objection as one by Todd Halbert, rather than by Mr. Vercnocke. That is an error on the docket; the document actually filed is clearly an objection by Mr. Vercnocke, and not by Halbert.

46. (Docket # 481.)

47. (Docket # 488.)

48. (Docket # 527.)

49. (*Id.* at ¶ 13 (emphasis added).) Fed. R. Bankr. P. 2016(a) requires "an application for compensation [to] include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, [and] the source of the compensation so paid or promised[.]"

50. (Docket # 527, Exhibit C.)

Thus, the December 18, 1996 fee application revealed only that the trustee had, by that time, entered into a surcharge agreement with Comerica "for services rendered in connection with the liquidation of Comerica's collateral." No further details or information regarding this agreement were disclosed.

### K. Proceedings leading to Judge Graves's February 4, 1999 opinion

The first round of litigation in this Court relating to the fraud on the court controversy began with a motion filed by Taunt on November 26, 1997. Judge Hughes's 2002 Opinion describes the events as follows: [51]

> On November 26, 1997, Mr. Taunt filed a motion for authority to disburse the remaining assets of the estate, which totaled approximately $80,000.[52] Mr. Taunt proposed a disbursement which would pay his and his attorneys' fees in full and then pay the balance to Comerica on account of the Section 507(b) "super-priority" damages it claimed.[53] The motion was filed more than a year after

the last of the three Comerica orders was signed.

Mr. Halbert, ... on his own behalf,[54] objected to Mr. Taunt's motion.[55] Mr. Halbert asserted that Comerica was not entitled to either a Section 507(b) claim or any other claim against the estate because of the alleged lender liability claim which the estate had against Comerica. While Mr. Halbert acknowledged that the Comerica Settlement Order encompassed the lender liability claim he was asserting, he argued that the settlement which supported that order was unenforceable because it lacked consideration.

. . .

Mr. Halbert then filed on February 26, 1998, a document he entitled "Supplement to Objections to Trustee's Motion for Authority to Disburse Funds and Motion for Order Disqualifying Trustee, Denying or Adjourning Hearing on Trustee's Disbursement Motion, Disallowing Bank's Alleged Super Priority Claim and for Discovery and Other Matters." [56] This supplemental document not only expanded the basis upon

---

**51.** The lengthy quotation that follows is from the Hughes 2002 Opinion at 3–6 (Docket # 913). Footnotes in the Hughes 2002 Opinion are omitted here. All footnotes in this quotation are added by this Court, to add certain record citations and comments to Judge Hughes's rendition.

**52.** (Docket # 608.)

**53.** Judge Hughes described Comerica's Section 507(b) claim this way:

Section 507(b) of the Bankruptcy Code provides that a creditor who has been granted adequate protection in connection with its collateral shall have a priority claim over all other administrative claims for any loss resulting from the debtor's use of the collateral which was not compensated by the grant of adequate protection. In the context of a converted Chapter 11 proceeding, such a "super-priority" claim is prior in

right to all other Chapter 11 administrative expenses but subordinate to all Chapter 7 administrative expenses. The court calculated the amount of Comerica's Section 507(b) claim in conjunction with Mr. Halbert's objection to Mr. Taunt's proposed distribution. It determined that Comerica was entitled to a Section 507(b) claim in the amount of $444,475.17.

(Hughes 2002 Opinion at 3 n. 4.)

**54.** As Judge Hughes explained elsewhere in his 2002 Opinion, "Mr. Halbert claimed standing to object on the basis that he personally had a Chapter 11 administrative expense for unpaid attorney's fees rendered on behalf of the Debtor as debtor-in-possession." (*Id.* at 2–3.)

**55.** (Docket # 612 (filed December 23, 1997).)

**56.** (Docket # 619.)

which Mr. Halbert opposed Mr. Taunt's request to pay Comerica's super-priority claim but also requested that the Comerica Settlement Order be set aside pursuant to FRCP 60(b)(4).[57] Mr. Halbert's argument for setting aside the Comerica Settlement Order was based upon the agreement Mr. Taunt had made with Comerica at the outset of the Chapter 7 proceeding whereby Comerica agreed to compensate Mr. Taunt and his attorney for services associated with the liquidation of Comerica's collateral. Mr. Halbert contended that Mr. Taunt's fee arrangement with Comerica represented a clear conflict of interest which should have been disclosed both as part of the appointment process for Mr. Taunt and his counsel as well as in connection with Mr. Taunt's motion for authority to settle the estate's lender liability claims against Comerica.

The court heard the various motions and objections raised by Mr. Halbert on December 14, 1998. Shortly before this hearing, the United States Trustee filed a statement with the court which addressed Mr. Halbert's claims that Mr. Taunt and his attorneys should be removed.[58] Apparently, the United States Trustee prepared this statement after the court had instructed his office to investigate Mr. Halbert's claims that Mr. Taunt and his attorney had violated their fiduciary duties to the estate.

The United States Trustee's statement was 18 pages of text with attached exhibits. The statement indicated that it was based upon the United States Trustee's interview of nine persons and his review of two deposition transcripts. However, the statement offered very little concerning the substance of these interviews and reviews. Instead, the statement focused on whether Mr. Taunt and his attorney had the duty to disclose their agreement with Comerica. The United States Trustee concluded that they did have a duty to disclose the arrangement pursuant to Fed. R. Bankr. P. 2014. The United States Trustee also recommended that the fees of Mr. Taunt and his attorney be reduced by 25% as a sanction for their failure to disclose this arrangement.

Mr. Taunt, Mr. Halbert, Comerica, and the United States Trustee all appeared at the December 14, 1998 hearing. While each offered argument, none presented testimony or other proofs. In particular, the United States Trustee did not call any of the persons whom he had interviewed or whose depositions he had reviewed. Nor did the United States Trustee summarize the substance of these interviews or reviews. Rather, he focused on the issues he had identified in his prior statement, those being Mr. Taunt's and his attorney's duty to disclose the agreement with Comerica and the appropriate sanction for their failure to disclose that arrangement.

Judge Graves presided at the December 14, 1998 hearing.[59] He took the matter under advisement and issued a written opinion and order on February 4, 1999[.][60]

## L. Judge Graves's February 4, 1999 opinion

Judge Hughes accurately described Judge Graves's February 4, 1999 opinion, in part, this way:

---

57. In this document, Halbert also asked the Court to disqualify and remove both Taunt (as trustee) and his counsel. (*Id.* at 16.)

58. (Docket # 661 (filed December 4, 1998).)

59. A transcript of the December 14, 1998 hearing is at Docket # 706.

60. (Hughes 2002 Opinion at 3–6.)

Judge Graves determined that Mr. Taunt and his attorney failed to disclose the Comerica Fee Agreement in violation of Rule 2014 and ordered that they be sanctioned by reducing their fees by 25%. Judge Graves also determined that Comerica was entitled to a Section 507(b) claim in the amount of $444,475.17 and that Mr. Taunt "did not breach his fiduciary duty by not bringing any Chapter 5 cause of action." However, his opinion and order were silent with respect to the remaining issues raised in Mr. Halbert's objection and motion, including his assertion that Comerica's entire claim should be disallowed and that the Comerica Settlement Order should be set aside.[61]

The Court would add to this description the following points about Judge Graves's opinion. Judge Graves found that:

- Taunt was "clearly require[d]" by Fed. R. Bankr. P. 2014 and 11 U.S.C. § 327 to disclose his agreement with Comerica.
- "[Taunt] had an affirmative duty under Fed. R. Bankr. P. 2014(a) to disclose the terms of the fee agreement."
- "[T]he actions of the Trustee were not designed to mislead [Halbert.]"
- "[T]he Trustee did not seek to undermine the court[.]"
- "[T]he Trustee made a conscious decision, after researching the issue, not to disclose the fee agreement. This conduct violates the dictates of Bankruptcy Rule 2014."
- Halbert "admits that he was aware of the agreement." [62]

In his opinion, Judge Graves did not discuss or decide whether Taunt or his attorneys had committed a fraud on the court, in failing to disclose the Comerica Fee Agreement and its terms, or in seeking and obtaining any of the orders relating to Comerica.

With respect to Comerica's § 507(b) claim, Judge Graves found that the "unrebutted affidavit" of Comerica's Vice–President of Special Accounts, Paul G. Dufault, demonstrated a § 507(b) claim in the amount of $444,475.17, and that there was no dispute as to that claim.[63]

Judge Graves's opinion is captioned as an "Opinion and Order." The text of the document does not actually contain an order expressly ruling on Taunt's motion authorizing distribution of funds, or Halbert's motion to vacate the Comerica Settlement Order and disallow Comerica's super-priority claim. Nor was any separate order filed ruling on these motions. The caption of the document, however, indicates that it is an "Opinion and Order" granting Taunt's motion for distribution and denying Halbert's motions.[64]

---

61. (*Id.* at 6–7 (footnote omitted).)

62. (Judge Graves's February 4, 1999 Opinion (Docket # 676 at 9, 10, 13, 14).)

63. (*Id.* at 4.) The affidavit of Paul G. Dufault referred to in Judge Graves's Opinion was filed by Comerica on January 20, 1998. (Docket # 615: "Comerica Bank's Response, [etc.]," Exhibit A (Aff. of Paul G. Dufault)). Docket entry # 615 states that this document is a Certificate of Service. This is an error in the docket entry.

64. The caption of Judge Graves's February 4, 1999 opinion is:
    OPINION AND ORDER ALLOWING TRUSTEE'S MOTION FOR DISTRIBUTION OF FUNDS AS REDUCED, AND DENYING MOTION FOR ORDER DISQUALIFYING TRUSTEE AND TRUSTEE'S COUNSEL, VACATING COMERICA BANK'S SETTLEMENT ORDER, AND DISALLOWING BANK'S ALLEGED SUPER–PRIORITY CLAIM, AND OBJECTION TO TRUSTEE'S MOTION FOR AUTHORITY TO DISBURSE FUNDS.
    (Docket # 676 at 1.)

## M. The first appeal to the district court

Halbert and the Debtor, M.T.G., Inc., appealed Judges Graves' February 4, 1999 "Opinion and Order" to the district court, and Taunt cross-appealed.[65] Judge Hughes's Opinion described the district court's decision on this appeal:

The district court ruled on Mr. Halbert's appeal on September 7, 2000. Both Mr. Halbert and Comerica filed motions to reconsider this ruling. The motion for reconsideration was heard on December 11, 2000. The district court issued a revised order at the conclusion of that hearing. . . .

The district court, like Judge Graves, focused most of its attention upon whether Mr. Taunt and his attorney should have been disqualified because of the fee arrangement they had reached with Comerica. The district court affirmed Judge Graves' conclusion that the fee arrangement required disclosure. However, the district court reversed Judge Graves' decision to reduce Mr. Taunt's and his attorneys' fees by only 25% and instead ordered that their fees be denied in their entirety. The district court also ordered that Mr. Taunt and his attorney be removed as representatives of the estate.

The district court remanded the matter to the bankruptcy court for further proceedings because it concluded that it was inappropriate for the bankruptcy court to allow Comerica's Section 507(b) claim in light of Mr. Taunt's potential bias in administering that claim. The district court did not vacate the Comerica Settlement Order because it determined that Mr. Halbert's challenge to that order was time barred.[66]

The Court would add to this description the following points about the district court's decision. The district court's decision was announced and explained in two bench opinions, given at the conclusion of the hearings on September 7, 2000 and December 11, 2000. In its bench opinion of September 7, 2000, the district court held that Taunt had to be disqualified as trustee, and he and his firm denied all fees, because of Taunt's fee agreement with Comerica and Taunt's failure to disclose that agreement. The district court held that Taunt:

- "at the least, had a conflict of interest and breached his fiduciary duty."
- had been "in constant breach of his fiduciary duty."
- had a "serious, egregious conflict of interest and breach of fiduciary duty." [67]

The district court declined to reverse or vacate the Comerica Settlement Order, solely because it found that Halbert's motion in the bankruptcy court had been untimely.[68] (As discussed below, the district court later reversed itself on this holding, in a later appeal.)

The district court "reversed" Judge Graves's decision allowing Comerica's § 507(b) super-priority claim. The district court held that both the § 507(b) order and the Comerica Settlement Order "resulted from a conflict of interest, a breach of fiduciary duty." [69] For that reason, the district court reversed (in a later order, "vacated") the § 507(b) order, and made

---

65. (Docket # # 679, 681.)

66. (Hughes 2002 Opinion at 7–8. (Docket # 913).)

67. (Tr. of September 7, 2000 hearing in the United States District Court in Case No. 99–

71031 at 35 (a copy of this transcript appears in this Court's record at Docket # 1166, Ex. 7).)

68. (*Id.* at 35, 40.)

69. (*Id.* at 40.)

clear that but for the untimeliness of Halbert's challenge to the Comerica Settlement Order, that would have been vacated for the same reason. The district court stated:

I am concerned that a sanction such as this [denial of fees] doesn't rectify the injustices that might have been done by a Trustee in such conflict of interest and in constant breach of his fiduciary duty. However, because the request to reverse the settlement order has been untimely in the law, and I don't see a satisfactory explanation for that untimeliness, I cannot take action against the settlement, the approval of the settlement itself.

. . .

The settlement order is not being vacated because the appeal from it here—the request for vacation is untimely. He is not untimely on the [§ 507(b) super-priority] issue, and that, like the settlement order, resulted from a conflict of interest, a breach of fiduciary duty. I cannot find, therefore, that it is unassailable. So I will reverse that as well.[70]

The district court then clarified that it was remanding the § 507(b) super-priority issue for further proceedings—"[w]hatever proceedings are appropriate."[71]

After the district court issued its initial Order and Judgment in the appeal, on October 10, 2000, Halbert and Comerica each moved for a reconsideration. The district court held a hearing on those motions on December 29, 2000. Among other things, Halbert argued that the district court should also reverse the Comerica Settlement Order, because it had been obtained by a fraud on the court, and the one-year time limit in Fed. R. Civ. 60(b) does not apply to fraud on the court claims. Thus, Halbert argued, his motion in the bankruptcy court to vacate the Comerica Settlement Order was not untimely.[72]

During a hearing on December 11, 2000, the district court refused to reverse itself, and reiterated its earlier holding that Halbert's motion to vacate the Comerica Settlement Order had been untimely. The court therefore reiterated its decision not to reverse or vacate the Comerica Settlement Order or Judge Graves's failure to vacate that order.[73] Just before making that ruling from the bench, the court indicated that its holding that Taunt had a conflict of interest did not necessarily mean that he had committed a fraud on the bankruptcy court:

[MR. HALBERT:] What appellant here would have this Court do is ignore what this Court has already held, that the Trustee and his counsel had severe conflicts.

THE COURT: Conflicts of interest, but never has this Court held that there was fraud on the Bankruptcy Court.[74]

The district court denied Halbert's motion for reconsideration, and granted Comerica's motion for clarification, and entered a revised "Order and Judgment" on December 29, 2000. It stated that "for the reasons stated on the record" during the December 11, 2000 hearing, the bankruptcy court was reversed by the district court's denying all fees to Taunt's counsel and disqualifying Taunt as trustee. The district court also "vacated" the bankruptcy court's order allowing the "507(b) super-priority claim" of Comerica and "remanded" that claim to the bankruptcy

---

70. (*Id.* at 35, 40.)

71. (*Id.* at 40–41.)

72. Tr. of December 11, 2000 hearing in the United States District Court in Case No. 99–71031 at 17 (a copy of the transcript of this hearing is in the record at Docket # 1159 (Ex. 7).)

73. (*Id.* at 24–25.)

74. (*Id.* at 23.)

court "for further proceedings consistent with the Court's opinion from the bench on September 7, 2000." The district court "affirmed" the bankruptcy court's "order and decision not to vacate the [Comerica S]ettlement [O]rder." [75]

### N. Proceedings on remand from the district court's 2000 decision and Judge Hughes's January 29, 2002 opinion

Following remand from the district court's decision, visiting Judge Hughes was assigned to this case. As Judge Hughes's 2002 opinion described, after the 2000 remand from the district court,

> Mr. Halbert was not content to have this court simply dispose of the matters remanded to it by the district court. Instead, Mr. Halbert filed two new motions, one on March 29, 2001 and another on April 25, 2001. These motions requested, among other things, that the three Comerica orders, they being the Comerica Claim Allowance Order, the Comerica Relief from Stay Order, and the Comerica Settlement Order, be set aside. The gist of Mr. Halbert's renewed effort to set aside the Comerica Settlement Order and his effort to set aside the other two Comerica orders is that these orders were procured by Mr. Taunt's, his attorney's, and/or Comerica's alleged fraud on the court. Specifically, Mr. Halbert asserts that these parties deceived the court by failing to disclose the existence of the fee arrangement which had been reached between them.[76]

In an order filed September 27, 2001, Judge Hughes organized and consolidated numerous motions and issues in this case, and scheduled further briefing and hearings on the issues. These included the fraud on the court issues raised by Halbert's March 29, 2001 and April 25, 2001 motions. With respect to the only issue expressly remanded to the bankruptcy court in the district court's 2000 decision, *i.e.*, Comerica's § 507(b) super-priority claim, Judge Hughes ruled that no further action was necessary at that time. He reasoned that the district court's order vacated the bankruptcy court's order to the extent it allowed Comerica's § 507(b) claim or authorized the trustee to make any distribution upon that claim. He interpreted the district court's order as permitting Comerica to resubmit its § 507(b) claim for allowance, but noted that neither Comerica nor the successor trustee had filed any motion after the district court remand to allow Comerica's § 507(b) claim. He therefore ruled that no further action would be taken concerning that claim at that time.[77]

After further briefing and a hearing, Judge Hughes issued an opinion on January 29, 2002.[78] Judge Hughes concluded "that grounds do exist to set aside" the Comerica Settlement Order, the Comerica Claim Allowance Order, and the Comerica Relief From Stay Order "on the basis that they were procured by fraud on the court." [79] He also concluded, however, that he was "prevented from setting aside these orders because of previous court rulings." [80] First, Judge Hughes reasoned

---

**75.** (Order and Judgment [of the United States District Court] (Docket # 762).)

**76.** (Hughes 2002 Opinion at 8.)

**77.** (*See* "Order Re: Various Motions and Objections Made by Halbert With Respect to Former Trustee Charles Taunt, Plunkett & Cooney, P.C., and Comerica Bank," filed Sep-

tember 27, 2001, at 11–13, 16 (Docket # 843).)

**78.** (Hughes 2002 Opinion (Docket # 913).)

**79.** (*Id.* at 1.)

**80.** (*Id.*)

that the district court's decision in the 2000 appeal established, as the law of the case, that Halbert's motion to vacate the Comerica settlement order was time-barred, because the motion was not brought within one year of the entry of the Comerica Settlement Order. That ruling also meant that Halbert's motions to vacate the other orders—the Comerica Claim Allowance Order and the Comerica Relief From Stay Order—were also time-barred because they were not filed within one year after entry of those orders. Although Judge Hughes questioned the correctness of the district court's decision that Fed.R.Civ.P. 60(b)'s one-year limit applied to a motion to set aside an order due to fraud on the court, he felt compelled to follow that decision and therefore to deny Halbert's motion to vacate the three orders at issue. Judge Hughes stated that "were it not for the district court ruling" on timeliness, he would set aside all three orders as being procured by fraud on the court.[81]

Notwithstanding these statements, however, Judge Hughes offered a second reason why he would not set aside the Comerica Settlement Order—namely, that Judge Graves had implicitly rejected Halbert's fraud on the court argument on its merits in his February 4, 1999 Opinion and Order. Judge Graves did this in two ways, according to Judge Hughes. First, even though Judge Graves's February 4, 1999 Opinion and Order "did not address Mr. Halbert's fraud on the court argument," Judge Hughes "interpreted its silence as being dispositive in favor of Mr. Taunt and against Mr. Halbert."[82] Second, Judge Hughes reasoned, "Judge Graves arguably assessed the propriety of approving the Comerica Settlement Order under the more stringent standard imposed when the trustee is not disinterested (i.e., trustee must establish that all aspects of the settlement are reasonable)."[83] Judge Hughes drew this conclusion from the statement in Judges Graves's 1999 Opinion that " 'the Trustee did not breach his fiduciary duty by not bringing any chapter 5 causes of action.' "[84]

In concluding that, but for these constraints, he would set aside the three orders as procured by a fraud on the court, Judge Hughes "accepted as true Taunt's contention that he had no intention whatsoever to deceive the court by withholding from it information concerning the fee agreement he and his attorney had reached with Comerica," and noted that "[t]here is certainly nothing in the record which would suggest that either Mr. Taunt or his attorneys actually intended to mislead the court."[85] Nonetheless, Judge Hughes concluded that the elements of a "fraud upon the court" existed, and that Taunt's failure to disclose the free agreement with Comerica deceived the Court by leading it to assume that the trustee was disinterested and impartial when he sought entry of the three orders at issue. Given that assumption, the trustee would be given the benefit of a deferential "business judgment rule," a presumption that would have led the Court to enter the three orders in the absence of any objections at the time. By contrast, Judge Hughes reasoned, if he had known of the trustee's fee agreement with Comerica, he would not have given the trustee the benefit of the business judgment rule, but rather would have required the trustee to demonstrate that the settlement with Comerica, allowance of Comerica's claim,

81. (*Id.* at 16–18.)

82. (*Id.* at 16.)

83. (*Id.* at 18.)

84. (*Id.* at 18.)

85. (*Id.* at 9–10.)

and granting Comerica relief from the stay were in fact reasonable.[86]

Judge Hughes also noted that "an argument can be made that Mr. Taunt's fee agreement with Comerica so compromised his duties as a fiduciary of the bankruptcy estate that approval of the settlement was inappropriate simply because Mr. Taunt could not fulfill his duty of loyalty to the estate no matter how convincing he might be as to the proposed settlement's fairness."[87] And he noted that the district court appears to have reached this conclusion in the 2000 appeal.[88]

### O. The second appeal to the district court

For the reasons stated in his January 29, 2002 Opinion, Judge Hughes entered a separate order denying Halbert's consolidated motion to vacate the Comerica Settlement Order, Comerica Claim Allowance Order, and Comerica Relief From Stay Order.[89] Halbert appealed, and on April 10, 2003 the district court issued a published opinion, *Halbert v. Taunt (In re M.T.G., Inc.),* 291 B.R. 694 (E.D.Mich. 2003).[90] The district court reversed its earlier decision that Halbert's motion to vacate the Comerica Settlement Order was untimely, and held that (1) the one-year time limit for bringing motions under Fed. R. Civ. 60(b) does not apply to motions for relief based upon a claim of fraud upon the court; and (2) there is no time limit for filing such a motion. 291 B.R. at 698 n. 4, 699–700. The district court "recall[ed] its previous mandate" and "remand[ed] to the Bankruptcy Court for its specific consideration of the fraud upon the court claim." *Id.* at 704. With respect to Judge Hughes's discussion of the merits of the

fraud on the court claim, the district court characterized that as "dicta." *Id.* at 703.

Halbert then moved for partial reconsideration of the district court's decision, asking the district court to determine itself whether Taunt had perpetrated a fraud upon the court. The district court denied this motion in an order filed May 1, 2003.

### P. Proceedings on remand after the district court's 2003 decision

By the time of the district court's 2003 remand, the undersigned judge had been appointed and assumed responsibility for this case. Also by then, Vining had been elected as the successor Chapter 7 trustee. After holding a scheduling conference, the Court directed the parties to file motions for summary judgment regarding the fraud on the court issues. (The Court chose this procedure as an appropriate vehicle for determining these issues on remand.) Such motions were filed by Vining and Halbert (jointly); Taunt; the Plunkett & Cooney law firm (into which Taunt's previous law firm merged, and which represented Taunt as trustee during part of the relevant time period); Comerica; and the Miller Canfield law firm (which represented Comerica during the relevant time period). In addition, the surety for Taunt as trustee, American Casualty Company of Reading, PA, concurred in Taunt's motion. (All of these parties except Vining and Halbert are sometimes referred to collectively in this opinion as the "Respondents.")

These motions were briefed and argued at length, and now are before the Court for decision.

---

86. (*Id.* at 10–13.)

87. (*Id.* at 11–12 n. 18.)

88. (*Id.* at 11–12 n. 18.)

89. (*See* Docket # 914.)

90. The district court's decision appears in this Court's record at Docket # 1032.

## II. Jurisdiction

This Court has subject matter jurisdiction over this case and these matters under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D.Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (G), and (O).

## III. Discussion

### A. The elements of fraud on the court

■ As the district court noted in its 2003 decision,

> Not all fraud is fraud upon the court. The type of fraud necessary to sustain an independent action attacking the finality of a judgment is narrower in scope than that which is sufficient for relief by timely motion under Rule 60(b)(3) for fraud on an adverse party. Fraud upon the court should embrace "only that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases."

*Halbert*, 291 B.R. at 699–700 (citations omitted). The elements of fraud on the court are: conduct:

(1) On the part of an officer of the court;

(2) That is directed to the "judicial machinery" itself;

(3) That is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth;

(4) That is a positive averment or is concealment when one is under a duty to disclose;

(5) That deceives the court.

*Workman v. Bell*, 245 F.3d 849, 852 (6th Cir.2001)(citing *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir.1993)).

### B. The three orders at issue were procured by fraud on the court.

■ Applying traditional summary judgment principles to the pending motions,[91] and based on the undisputed facts, the Court now concludes that each of the following orders of this Court was obtained by a fraud upon the court committed by Charles J. Taunt, acting as Chapter 7 trustee, and by his counsel:

- The April 19, 1996 Comerica Claim Allowance Order (Docket # 422)
- The April 30, 1996 Comerica Relief From Stay Order (Docket # 431), which was entered after Taunt consented to the order
- The August 29, 1996 Comerica Settlement Order (Docket # 488) [92]

Each of these orders benefitted Comerica, and each order was entered at Taunt's request, or in the case of the Comerica Relief From Stay Order, based on Taunt's written consent and with his assistance. Each order was entered after Taunt made his fee agreement with Comerica, and without Taunt having properly disclosed that fee agreement to the Court. As Bankruptcy Judge Graves (in his 1999 opinion) and District Judge Taylor (in her

---

**91.** For a detailed discussion of these summary judgment principles, *see Exemplar Manufacturing Co. v. Lear Corp. (In re Exemplar Manufacturing Co.)*, 331 B.R. 704, 709–10 (Bankr. E.D.Mich.2005).

**92.** In their joint summary judgment motion, Halbert and Vining also appear to argue that the May 28, 1996 Becker Group settlement order (Docket # 446), described in Part I(F) of this opinion, also should be vacated for fraud on the court. The court cannot take such action at this point. To date, neither Halbert nor Vining has filed and served on Becker Group, Inc. a motion to vacate the Becker Group settlement order, and Becker Group, Inc. has not participated in the proceedings to date regarding the fraud on the court issues.

749

bench opinion delivered on September 7, 2000) held, Taunt clearly had a duty to disclose that fee agreement. Because these orders were obtained by fraud upon the court, they will be vacated.

Initially, the Court would note that the district court appears to have sent some mixed signals in its two appeal decisions, at least on the question whether the Comerica Settlement Order must be vacated. In the first appeal, in its September 7, 2000 bench opinion, the district court stated that *but for* the untimeliness of Halbert's fraud on the court challenge, the court would have vacated the Comerica Settlement Order, because it was obtained by Taunt when he had a "serious, egregious" conflict of interest, and because it "resulted from a conflict of interest, a breach of fiduciary duty." Yet in the second appeal, when the district court reversed itself on the timeliness issue, the court did not vacate the Comerica Settlement Order, but simply remanded the case to this Court to consider whether there had been a fraud on the court. Furthermore, during the December 11, 2000 hearing in the first appeal, the district court drew a distinction between Taunt's conflict of interest, which it had found, and fraud on the bankruptcy court. The district court stated that it had *not* found fraud on the court.[93]

Despite these mixed signals about whether the Comerica Settlement Order should be vacated, this Court is clearly required by the district court's mandate to determine whether there was a fraud on the court, and if there was, to enter appropriate relief.

All of the elements of fraud on the court are met here. As to the first element, as

the Chapter 7 trustee in this case, Taunt was an officer of the court. Taunt was also an officer of the court in his capacity as one of the appointed attorneys for the trustee. Similarly, the other lawyers from Taunt's law firms during the relevant times, who were appointed as his counsel, were also officers of the court. The firms were Charles J. Taunt & Associates (which later merged into Plunkett & Cooney, P.C.), and Plunkett & Cooney, P.C. *See, e.g., Official Committee of Unsecured Creditors v. Michelson (In re Michelson),* 141 B.R. 715, 727 (Bankr.E.D.Cal.1992)(bankruptcy trustee and attorneys are officers of the court). No one disputes these conclusions.

As to the second element, the conduct at issue—Taunt's obtaining orders from this Court without disclosing his fee agreement with Comerica, which he had a duty to disclose—was certainly "directed to the 'judicial machinery' itself," rather than merely directed at a private party.

The third fraud on the court element, that the conduct be "intentionally false, wilfully blind to the truth, or in reckless disregard for the truth," is also established by the undisputed facts. It is true that Judge Graves, in his 1999 opinion, found that Taunt "did not seek to undermine the court," and that his actions "were not designed to mislead" Halbert.[94] And in his 2002 opinion, Judge Hughes "accepted as true" that Taunt had no intention to deceive the Court in failing to disclose the Comerica Fee Agreement, and noted that "there is certainly nothing in the record" to indicate that either Taunt or his attorneys "actually intended to mislead the Court."[95] But these findings were made by Judge Graves and Judge Hughes with-

93. *See supra* discussion in Parts I(M) and I(O) of this opinion.

94. *See supra* discussion in Part I(L) of this opinion.

95. *See supra* discussion in Part I(N) of this opinion.

750

out either judge having held an evidentiary hearing or trial on this issue. And in the case of Judge Hughes's 2002 opinion, his comments on this subject were swept aside by the district court's 2003 decision, as mere "dicta." [96]

The district court, in the appeals, made no findings or conclusions regarding whether Taunt or his attorneys intended to deceive the Court. This Court is unable to make a finding on this specific-intent issue, based on the present record, on cross-motions for summary judgment. The Court therefore will assume without deciding, for purposes of this decision, that neither Taunt nor his attorneys intended to deceive this Court.

Nonetheless, the Court must conclude that the conduct of Taunt and his attorneys was "in reckless disregard for the truth" and in reckless disregard of their disclosure duties. "Reckless disregard" is "[c]haracterized by the creation of a substantial and unjustifiable risk of harm to others, and by a conscious (and sometimes deliberate) disregard for or indifference to that risk." *See* Black's Law Dictionary

1276 (7th ed.1999); *see also Roberts v. Erhard (In re Roberts )*, 331 B.R. 876, 884 (9th Cir. BAP (Idaho) 2005).

Taunt and his attorneys obtained the three orders in question after Taunt had represented to the Court that

● Charles J. Taunt & Associates, and later, Plunkett & Cooney, P.C., and Taunt himself (as a member of those firms,) did not have any connection with the creditors or any other party in interest in the case;

● these firms representing Taunt had no interest adverse to the creditors; and

● these firms were disinterested as defined under the Bankruptcy Code.[97]

Because of the Comerica Fee Agreement, these representations were not true. In making these representations, Taunt and his attorneys disregarded the true state of affairs, and created a substantial and unjustifiable risk of harm to the integrity of the judicial process.

Judge Graves held in his 1999 opinion that Taunt had a "clear" and "affirmative" duty under Fed. R. Bankr. P. 2014(a) [98] and 11 U.S.C. § 327 [99] to disclose the Com-

**96.** *See supra* Part I(O) of this opinion.

**97.** Under the Bankruptcy Code, "[t]he term 'disinterested person' means a person that ... does not have an interest materially adverse to the interest of the estate or of any class of creditors ... for any ... reason." 11 U.S.C. § 101(14)(C).

**98.** Fed. R. Bankr. P. 2014(a) provides:
(a) Application for an order of employment An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee.... The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's con-

nections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.
(emphasis added).

**99.** Section 327(a) of the Bankruptcy Code provides:

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate,

erica Fee Agreement and its terms. Judge Graves further found that Taunt "made a conscious decision, after researching the issue, not to disclose the fee agreement." These findings and conclusions were clearly established by the record, and they were not disturbed by the district court in any of its opinions or orders. Neither Taunt nor any other party has ever cited to Judge Graves, Judge Hughes, or the undersigned judge, any authority (statute, rule, or case) that colorably supports a conclusion that Taunt did **not** have a duty to disclose the Comerica Fee Agreement.

The district court, in its September 7, 2000 bench opinion in the first appeal, held that Taunt's fee agreement with Comerica created a "serious, egregious, conflict of interest and breach of fiduciary duty," and "that a sanction ... doesn't rectify the injustices that might have been done by a Trustee in such conflict of interest and in constant breach of his fiduciary duty." [100] This Court, of course, is bound by these holdings of the district court, as the law of the case and under the "mandate rule." *See Halbert v. Taunt (In re M.T.G. Inc.),* 291 B.R. 694, 701 (E.D.Mich.2003). Thus, Taunt had a "serious, egregious, conflict of interest," contrary to his representations to this Court.

A stark illustration of Taunt's undisclosed conflict of interest is that under the Comerica Fee Agreement, Taunt's firm was to be paid on an hourly-rate basis *by Comerica* to review and analyze **Comerica's** secured claim **against the estate**.[101] This aspect of the fee agreement alone destroyed Taunt's disinterestedness. Then, after making the undisclosed fee

agreement, Taunt and his counsel signed a stipulation and obtained from the Court the Comerica Claim Allowance Order. That Order allowed Comerica's $5.3 million secured claim and determined that Comerica had a "valid and properly perfected security interest in and lien on all property of Debtor's estate" except Chapter 5 causes of action.[102] At a minimum, it was "reckless" of Taunt and his counsel not to fully disclose the Comerica Fee Agreement before he obtained this Order.

Bankruptcy Code § 506(c) permits a trustee to surcharge a secured creditor's collateral, with or without that creditor's agreement, if certain requirements are met. Under § 506(c),

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

11 U.S.C. § 506(c). Comerica agreed to a surcharge of its collateral, to the extent and under the terms of the Comerica Fee Agreement.

It may well be that a trustee must always disclose to the court a § 506(c) surcharge agreement. But quite apart from that issue, the Comerica Fee Agreement went well beyond what § 506(c) authorizes. The surcharge authorized by the statute is for the trustee to recover the "reasonable, necessary costs and expenses of preserving, or disposing of," the secured creditor's collateral. The Comerica Fee Agreement gave Taunt more than this. It required Comerica to pay the trustee's law firm for additional work, not involving preservation

---

and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

**100.** (*See supra* discussion in Part I(M) of this opinion.)

**101.** *See supra* discussion in Part I(C) of this opinion.

**102.** *See supra* discussion in Part I(G) of this opinion.

or disposition of Comerica's collateral, such as the trustee's work in reviewing, analyzing, and determining Comerica's secured claim, discussed above. Moreover, the surcharge authorized by § 506(c) is limited to "the extent of any benefit to" the secured creditor. The Comerica Fee Agreement clearly was not so limited. Rather, Taunt's firm was to be paid for its work on an hourly-rate basis without regard to the amount of benefit to Comerica. The agreement provided that the Taunt firm's "compensation is not contingent upon [its] actual or perceived degree of success."[103] And while there was a $25,000 initial budget for the Taunt firm's work, the agreement permitted fees above and beyond the budget for any covered matters that became contested, and for any "unanticipated and uncontrollable" matters.[104]

Given all of this, the duty of Taunt and his firm to disclose the Comerica Fee Agreement was so clear that their failure to disclose must be viewed as "reckless." Taunt's conduct rose at least to the level of "reckless disregard" of the truth and of his duties.

The fourth element of fraud on the court—a concealment when one is under a duty to disclose—clearly is met here: Taunt and his attorneys concealed Taunt's fee agreement with Comerica when there was a clear duty to disclose it to the bankruptcy court.

The issue under the fifth and final element of fraud on the court is whether the conduct of Taunt and his appointed counsel "deceived the court." The Court concludes that it did.

The orders in question, of course, were obtained from this Court when Judge Graves was the presiding judge. In his 1999 opinion, Judge Graves did not discuss or decide whether Taunt or his attorneys had committed a fraud on the court. Nor did Judge Graves make any findings about whether he had been deceived by Taunt's non-disclosure of the Comerica Fee Agreement, when he entered the three orders in question.

In his 2002 opinion, Judge Hughes stated the five elements of fraud on the court, including the "deceived the court" element, and stated that he would find a fraud on the court and vacate the orders in question, *if* the district court had not concluded that Halbert's fraud on the court claim was time-barred. Implicitly, at least, Judge Hughes therefore found that Taunt deceived the court. As already noted, however, the district court later swept away this discussion in Judge Hughes's 2002 opinion as "dicta," and remanded for a fresh consideration of the fraud on the court claim.

In determining whether Taunt and his attorneys deceived the bankruptcy court, this Court must view the issue in the light of the holdings of the district court in the two appeals, which are binding. In particular, the Court is bound by the district court's holding in the 2000 appeal that Taunt's fee agreement with Comerica created a "serious, egregious conflict of interest." From this it follows that Taunt and his attorneys did deceive the bankruptcy court, when they obtained the three orders in question without disclosing the fee agreement, because each of the orders benefitted Comerica. When he sought the orders in question, Taunt failed to disclose to the bankruptcy court that he was acting under a "serious, egregious conflict of interest." Judge Graves certainly did not know this when he entered the orders in question, nor did he know about the Comerica Fee Agreement or the terms of that agreement. It seems inconceivable that

---

**103.** *See supra* discussion at Part I(C) of this opinion.

**104.** (Docket # 1166, Ex. 4 at 1, 4.)

Judge Graves would have entered any of these orders at all, much less without a hearing, had Taunt fully disclosed his fee agreement with Comerica. Thus, the bankruptcy court was deceived when it entered these orders.

For these reasons, the Court concludes that Taunt and his counsel committed a fraud upon the court in obtaining the three orders in question. Those orders must be vacated.

## C. Other arguments of the parties

The foregoing discussion disposes of some of the arguments of the parties. Other arguments are discussed next.

### 1. Taunt's argument that Halbert's fraud on the court claim is untimely because it was not brought "within a reasonable time" after the orders in question were entered, within the meaning of Fed. R.Civ.P. 60(b)

Taunt argues that Halbert's fraud on the court allegation, which Halbert first made more than a year after the orders at issue were entered, was not timely because it was not brought "within a reasonable time," as required for a motion under Fed. R.Civ.P. 60(b). That rule applies in bankruptcy cases generally under Fed. R. Bankr. P. 9024, but its time limits have no application here.

■ First, Rule 60(b) itself says that "[t]his rule does not limit the power of the court ... to set aside a judgment for fraud upon the court." The federal courts have inherent power, independent of any authority under Rule 60(b), to vacate orders obtained by fraud upon the court, and to order other appropriate relief. *See, e.g., Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Levander v. Prober (In re Levander),* 180 F.3d 1114, 1118 (9th Cir.1999). In a leading case on the subject, *Hazel–Atlas Glass*

*Co. v. Hartford–Empire Co.,* 322 U.S. 238, 239, 245, 64 S.Ct. 997, 88 L.Ed. 1250 (1944), the United States Supreme Court vacated a decision of the court of appeals that had been obtained by fraud on that court, even though the action seeking relief was filed *nine years* after the decision. The Supreme Court held that a lack of diligence by a party seeking relief for fraud on the court does not prevent relief:

> But even if Hazel did not exercise the highest degree of diligence Hartford's fraud cannot be condoned for that reason alone. This matter does not concern only private parties.... [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

322 U.S. at 246, 64 S.Ct. 997.

Second, the Sixth Circuit case that Taunt cites, *Olle v. The Henry & Wright Corp.,* 910 F.2d 357, 365 (6th Cir.1990), does not hold that Rule 60(b)'s "reasonable time" requirement applies to a motion based on fraud on the court. That case involved a motion under Rule 60(b), and did not involve a claim of fraud on the court.

■ Third, Taunt's argument flies directly in the face of the district court's decision in the 2003 appeal, which of course is binding on this Court. The district court held not only that Rule 60(b)'s

one-year time limit for filing a motion for relief from judgment does not apply, but also that there is "no time limit" for seeking relief based on a claim of fraud upon the court. *Halbert,* 291 B.R. at 698 n. 4, 699–700. Thus, Rule 60(b)'s "reasonable time" requirement does not apply here.

## 2. The argument that Taunt's fee agreement with Comerica was disclosed to the bankruptcy court

Respondents argue that the Comerica Fee Agreement was disclosed to the bankruptcy court in several ways, and that as a result, the bankruptcy court was not deceived when it entered the three orders in question. The Court has described each disclosure by Taunt upon which Respondents rely, in Parts I(D) through I(F) and I(J) of this opinion. As that discussion shows, Taunt's disclosures disclosed virtually nothing, and they certainly fell far short of properly disclosing the Comerica Fee Agreement and its terms. And the last of these disclosures, buried in the first interim fee application that Taunt's counsel filed on December 18, 1996, came almost four months after the last of the three orders in question was entered. This argument by Respondents, then, is plainly without merit.

## 3. The argument that Todd Halbert knew that Taunt had a surcharge agreement with Comerica, and failed to timely disclose it to the bankruptcy court himself, so that he is estopped or otherwise barred from later claiming that there was a fraud on the court

Respondents argue that at all relevant times Todd Halbert knew that Taunt had some sort of surcharge agreement with Comerica, and that Halbert did not bring it to the Court's attention, or otherwise object to any of the orders in question, until long after they were entered. Based on this, Respondents argue that Halbert is

equitably estopped or otherwise barred from claiming fraud on the court now.

■ This argument, of course, does not apply to Vining, the successor trustee, who joins Halbert in seeking relief for fraud on the court. As to Halbert, there may be genuine issues of fact regarding what Halbert knew about the Comerica Fee Agreement and when he knew it. But those issues are not material here. This Court has inherent authority, and indeed a duty, to consider whether there has been a fraud on the court, and if so, to order an appropriate remedy, whenever such a fraud comes to the Court's attention. This is so regardless of who brings it to the Court's attention, and whether the party alleging fraud on the court has clean hands or not. *See, e.g., Martina Theatre Corp. v. Schine Chain Theatres, Inc.,* 278 F.2d 798, 801 (2d Cir.1960):

> Were the characterization [of a party's conduct as "fraud on the court"] accurate, the defrauded district court would have been empowered to take action *sua sponte* to expunge the judgment, and we would suppose that anyone, whether his hands were clean or dirty, could suggest that it do so. Indeed, as much is indicated by *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* [322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) ].

In his January 29, 2002 Opinion, Judge Hughes rejected an argument very similar to the argument that Respondents now make, and this Court agrees with Judge Hughes's reasoning:

> I also conclude that Mr. Halbert is not estopped from bringing this motion because he had consented to the entry of the three orders notwithstanding his prior knowledge of the surcharge agreement between Mr. Taunt and Comerica Bank. Mr. Halbert argues that he would not have given his consent had he known the full extent of the relationship be-

tween Mr. Taunt and Comerica. Be that as it may, I conclude that Mr. Halbert has standing to bring the consolidated motion regardless of his consent to the orders or his knowledge of the surcharge agreement. **The issue which Mr. Halbert raises is directed towards protecting the integrity of the judicial system itself. Public policy demands that the court address claims that its procedures have been subverted regardless of how tainted the source of the information may be.**[105]

4. **Respondents' "law of the case" argument, that Judge Graves's 1999 opinion held that there was no fraud on the court, and that this holding was never vacated or reversed by the district court on appeal**

Respondents argue that Judge Graves's 1999 opinion must be viewed as rejecting Halbert's fraud on the court argument, and that this decision was not disturbed by the district court in either of the later appeals. As a result, Respondents contend, the law of the case is that there was no fraud on the court. Halbert had argued fraud on the court before Judge Graves issued his February 4, 1999 Opinion and Order. But Judge Graves's opinion did not expressly consider or decide the fraud on the court claim, and did not expressly consider whether the elements of fraud on the court were established. In his 2002 opinion, Judge Hughes interpreted this silence by Judge Graves as implicitly rejecting Halbert's fraud on the court argument.[106]

■ As noted previously, the district court's 2003 appeal decision characterized Judge Hughes's 2002 opinion as mere "dicta" to the extent it discussed the merits of

the fraud on the court claim, and remanded to this Court for "specific consideration of the fraud upon the court claim." The district court obviously did not view Judge Graves's 1999 opinion as having decided the fraud on the court issue. In any event, any such implicit decision by Judge Graves necessarily was vacated, when the district court remanded the fraud on the court issue to this Court. Presently, the law of the case that binds this Court is that Halbert's fraud on the court claim is open for decision on the merits. For these reasons, this Court must reject Respondents' "law of the case" argument.

Moreover, this Court does not interpret Judge Graves's 1999 opinion as having decided the fraud on the court issue at all. Because that opinion did not expressly address the fraud on the court issue, or whether the elements of fraud on the court had been demonstrated, that opinion cannot be taken to have decided the fraud on the court issue. Rather, it appears that Judge Graves simply overlooked the issue.

There is a possible alternative view of Judge Graves's 1999 opinion, namely that he intended to reject the fraud on the court claim, based upon his findings that Taunt "did not seek to undermine the court" and did not intend to mislead Halbert; and that Halbert "admits that he was aware of the" fee agreement between Taunt and Comerica. These findings, however, are not sufficient under the law to dispose of Halbert's fraud on the court claim. The trustee's lack of intent to deceive the court or Halbert does not foreclose a finding of fraud on the court, because even without intent to deceive, a "reckless disregard" by Taunt of the truth and of his duties is sufficient. Judge Graves's opinion did not discuss the "reckless disregard" element, which by 1999

---

**105.** (Hughes 2002 Opinion at 19 n. 25 (emphasis added).)

**106.** (*Id.* at 16.)

was established in the Sixth Circuit as an element of fraud on the court. *See, e.g., Demjanjuk v. Petrovsky,* 10 F.3d 338, 348 (6th Cir.1993). Furthermore, as discussed earlier in this opinion, Halbert's awareness of the Comerica Fee Agreement is immaterial to the fraud on the court inquiry, and nothing in Judge Graves's opinion held otherwise.

As discussed in Part I(N) of this opinion, Judge Hughes noted in his 2002 opinion that Judge Graves's 1999 opinion "arguably" assessed the propriety of approving the Comerica Settlement Order under a more stringent standard than the "business judgment rule" applicable when a trustee is disinterested. This Court disagrees with this dicta from Judge Hughes's 2002 opinion. But even if this "arguable" conclusion could be drawn from Judge Graves's 1999 opinion, and even if this can be viewed as a ground on which Judge Graves rejected Halbert's fraud on the court argument, that has all been swept away by the district court's later appeal decisions, including the mandate in the 2003 appeal that this Court now give "specific consideration of the fraud upon the court claim." *Halbert,* 291 B.R. at 704.[107]

### 5. The additional relief requested by Halbert and Vining for Taunt's fraud on the court

Halbert and Vining ask for additional relief for fraud on the court, in addition to the Court's vacating the three orders at issue. The Court concludes, however, that none of the additional relief can or should be granted at this time.

■ First, Halbert and Vining ask the Court to deny all relief to Comerica as a creditor in this bankruptcy case, such as, for example, disallowing Comerica's secured claim and requiring Comerica to disgorge all sums that it has received on its claim. There are cases holding that a court may deny all substantive relief to a party that commits a fraud on the court, including the Supreme Court's decision in *Hazel,* 322 U.S. at 250–51, 64 S.Ct. 997. But here, the fraud on the court was committed by Taunt and his counsel, not by Comerica or Comerica's counsel. Comerica itself was not an "officer of the court," the first element necessary for fraud on the court. Comerica's attorneys in the bankruptcy case were officers of the court. But even if one assumes that Comerica could be deemed to commit a fraud on the court because of fraudulent conduct by its attorneys, the present record does not per-

---

**107.** Similarly, the Court must reject Taunt's argument that the only issue properly before this Court on remand from the 2003 appeal decision is whether to allow Comerica's § 507(b) claim. First, that claim was not discussed in the district court's 2003 decision, and was not included in the 2003 remand. That issue was remanded to the bankruptcy court by the district court's decision in the 2000 appeal, after the district court vacated Judge Graves's 1999 Opinion and Order to the extent it allowed Comerica's § 507(b) claim. Judge Hughes dealt with that issue after the 2000 remand, however, in his order filed September 27, 2001. There, he concluded that no further action was necessary on the vacated § 507(b) claim order, unless and until the successor trustee or Comerica filed a new

motion to allow Comerica's § 507(b) claim. *See supra* discussion in Part I(N) of this opinion. That has never happened. The successor trustee, Vining, certainly has not filed such a motion. Nor will the Court construe Comerica's motion for summary judgment, regarding the fraud on the court issue, as such a motion.

To the extent Taunt argues that the district court's 2003 mandate, remanding the case to this Court for "specific consideration of the fraud upon the court claim" is a reference to consideration of Comerica's § 507(b) claim, and nothing more, that argument is plainly without merit. The issues determined by this opinion are clearly included in the district court's 2003 remand.

mit the Court to find, based on the summary judgment motion filed by Halbert and Vining, that any of Comerica's attorneys committed a fraud upon the court. The duty to disclose the Comerica Fee Agreement was a duty owed by Taunt, as the Chapter 7 trustee, and by his appointed counsel. The conflict of interest found by the district court was a conflict that Taunt had, as trustee, not a conflict of interest on the part of Comerica or its counsel.

Halbert and Vining argue, in their summary judgment motion, that Comerica and its counsel engaged in a conspiracy with Taunt to defraud the bankruptcy estate, and violated numerous criminal statutes. On the present record, and at this summary judgment stage, the Court is unable to make such a determination. Such claims are the subject of an adversary proceeding filed by Vining, on behalf of the estate and against Comerica, Taunt, their respective attorneys, and others, entitled *Vining v. Comerica Bank,* Case No. 03–4950. The Court concludes that such claims should be litigated and determined in the pending adversary proceeding.

Halbert and Vining also seek punitive damages, and Halbert seeks an award of attorney fees, for fraud on the court. There is authority that punitive damages and attorney fees may be awarded for a party's fraud on the court. *See, e.g., Tenn–Fla Partners v. First Union National Bank of Florida (In re Tenn–Fla Partners),* 226 F.3d 746, 751 (6th Cir.2000). The Court concludes that it cannot and should not award any such relief at this point.

■ With respect to punitive damages, the Court's decision is discretionary. *Id.*

It is premature, at best, to award punitive damages against Taunt or his counsel on the present record. While the Court today concludes that Taunt and his counsel committed fraud on the court, that conclusion is not based on a finding of intent to deceive or defraud the court, but rather on a finding of "reckless disregard" of the truth and of duty by Taunt and his counsel. Without a finding of intent to deceive or defraud, punitive damages are not appropriate. The Court will reserve decision at this time on whether it would assess punitive damages against Taunt and/or his counsel, if and when it finds in the future (for example, in the pending adversary proceeding,) an actual intent to deceive or defraud the Court.

■ As to Halbert's request for attorney fees, an important factor for the Court to consider in deciding whether to award fees, and if so, in what amount, is whether the very substantial amount of work that Halbert has done over the years, in pursuing his fraud on the court allegations, will in the end actually benefit the bankruptcy estate, and if so, to what extent. *Cf.* 11 U.S.C. §§ 503(b)(3)(D), 503(b)(4).[108] Today Halbert and Vining have succeeded in obtaining a finding of fraud on the court and the vacation of three orders. But it is still far from clear whether any of this ultimately will result in a benefit to the bankruptcy estate and its creditors. For example, while the Court is vacating the Comerica Claim Allowance Order, it is unknown at this point whether in the end, Comerica's claim once again will be allowed. Similarly, while the Court is vacating the Comerica Settlement Order, it is unknown whether Vining, Trustee ulti-

---

108. These sections are cited as analogous support; they are not directly applicable in this context. They permit the court, in a Chapter 11 case, to award actual and necessary expenses and reasonable attorney fees for a creditor and its attorney who make "a substantial contribution" in the case. Such attorney fees are "based on the time, the nature, the extent, and the value of such services," among other factors.

mately will succeed on any claim against Comerica, such as a lender-liability claim.

For these reasons, the request by Halbert and Vining for punitive damages and attorney fees must be denied at this time, subject to renewal at a later, appropriate date.

## IV.  Conclusion

For the reasons stated in this opinion, the Court will grant the joint summary judgment motion of Halbert and Vining, to the extent of vacating the Comerica Relief From Stay Order; the Comerica Claim Allowance Order; and the Comerica Settlement Order.  Otherwise, that summary judgment motion will be denied.  The Court also will deny the motions for summary judgment filed by the Respondents. The Court will enter a separate order consistent with this opinion.